In every asylum case, the applicant must submit an extra copy of her application to the immigration judge who forwards the application to the State Department. Typically, almost always, there is only a stamped, boilerplate response from the State Department. However, in this case, we have a letter. The letter is addressed to the immigration judge and is signed by Mark J. Susser, Acting Director for the Office of Asylum Affairs. It's dated August 9, 1999, and it can be found at pages 836 through 838 of the administrative record. I'll start my argument with a brief summary of the letter. It describes the deterioration of relations between Ethiopia and Eritrea, noting that since May of 1998, more than 52,000 persons born in Eritrea or of Eritrean background have been expelled from Ethiopia. The letter explains that the Eritrean Embassy in Addis Ababa has a skeleton staff and does not issue Eritrean passports. Furthermore, the consulate office at the Eritrean Embassy in Washington has confirmed that Eritrea does not automatically grant Eritrean citizenship or travel documents to Ethiopian deportees of Eritrean origin. Finally, the letter notes that many Ethiopian deportees are deprived of legal documentation confirming their Ethiopian citizenship as the documents are destroyed or confiscated by the authorities during the deportation process. In this case, the agency's negative credibility finding is based almost entirely on Ms. Mohamed's inability to provide identity documents. Ms. Mohamed's family was violently taken from her by armed soldiers in the night, and she was forced to flee Ethiopia. The explanation why she could not obtain identity documents is clear, and it's in the record. What was the record citation for the letter? 836 through 838. Ms. Mohamed cannot provide Eritrean documents because she was born in Ethiopia and is not Eritrean by birth. She cannot provide Ethiopian documents for two reasons. First, she never had a birth certificate because she was born at home. Second, the political climate in Ethiopia and the ethnic cleansing of persons of Eritrean ethnicity made obtaining an Ethiopian identity document impossible and dangerous for both Ms. Mohamed and her family. We submit that Ms. Mohamed credibly established her identity as an Ethiopian whose family is of Eritrean origin during her removal proceedings. Although she was not able to obtain a birth certificate or other identity document, there's no evidence of record that such documents exist, and ample evidence regarding why they would be unavailable if they did exist. Ms. Mohamed was able to establish her identity through other credible evidence. She presented hundreds of pages of consistent, plausible, and specific testimony. She presented the testimony of two witnesses. One witness, whom Ms. Mohamed's family is Eritreans for many years ago, living in Addis Ababa. The other witness traveled back to Ethiopia from the United States, met with the family's former neighbor to discuss what had happened, visited the family's former home and business, and took pictures of the home. And this is on the record. We submit that the agency's negative credibility finding departed from the principles set forth by this Court's case law and is based entirely on impermissible speculation and conjecture. We don't believe that it's based in substantial evidence of record. And from the record, it's contrary to what the agency claims. Ms. Mohamed actually presented a well-documented and detailed asylum application. And if I may, I'd like to reserve the rest of my time for rebuttal on this. Very well. Thank you. If there are questions on this. All right. Thank you very much. Thank you. Good morning, Your Honors, and may it please the Court. My name is Jonathan Robinson. I'm here on behalf of the Attorney General, Michael B. Mukasey, the respondent in this matter. Your Honors. Are you from Washington? Yes, Your Honor. Washington, D.C. The really key issue in this case is what the immigration judge did here. The immigration judge... Can you talk a little louder? Oh, yes, certainly. The immigration judge... I mean, the audience is restraining. I apologize, Your Honor. That's good where he went to law school. He got an equal time. He humanized himself, too. The immigration judge in this particular case... Oh, you want me to talk to the children? How did you end up in Washington? Where did you go to law school? Oh, well, I grew up in Maryland, which is right outside of Washington, D.C. I went to law school at Washington and Lee University. That's in Lexington, Virginia. Washington and Lee? Yes. That has more Supreme Court justices than any other college, right? Yep, yep. Well, maybe one day. Who knows? But right now I work for the United States Department of Justice. And anything else you guys want to know about me? Should I go through the case with them as well? Well, you like your job. I have mixed feelings, Your Honor. All I can say is good for you. All right. Well, as I was saying, the really key issue in this particular case is what the immigration judge did. Because she gave the petitioner the blueprint for how to establish her identity. She said, go to the Eritrean Embassy, go to the consulate. At the lower proceedings when date of entry was an issue, she said, go to the airlines and get me. They keep fastidious manifest records. Go get me the proof that you were on this plane. Your uncle, who you've been in frequent contact with, go contact him. Get some evidence of his identity if you can't even get your own. And the problem here is that the petitioner didn't comply with what the immigration judge wanted. But she tried, didn't she? Well, you have to look at the context in which she claimed to have tried. Now, remember that this case had underlying proceedings, went up to the board, and it was remanded. Now, at those lower proceedings, she hadn't established to the satisfaction of the immigration judge her identity. But she gets a second bite of the apple, gets remanded and goes back down. Goes before the immigration judge. And the immigration judge says, look, we're going to continue this thing solely for the purpose of submitting new evidence. Okay? It was originally supposed to be continued for 90 days, gets continued for months and months. Finally gets before the immigration judge at the merits hearing. And did they say to the immigration judge, here's all that evidence that you asked us to submit? No. What they said was, we rest on the record. It seems like you're opposing counsel saying, well, from my reading of what the immigration judge said was, I need your birth certificate because you failed to prove your identity, and that's a critical aspect of your asylum claim. But she said she couldn't get her birth certificate, and there's evidence in the record that there wouldn't even be one. Your Honor, the key here isn't that she wasn't able to obtain easily available corroborating evidence. The problem here is that she didn't show the immigration judge that she even tried to get that evidence. Now, remember, she goes up to the immigration judge, and the petitioner says, we rest on the record, knowing full well that that record isn't sufficient in the mind of the immigration judge. Who said she rests on the record? Counsel. And who was counsel? I believe it was Ansel at the time. Who? Marcus Ansel, I believe is the name. Okay. And where is that person? I believe they're no longer representing the petitioner. And what's that person's status? I don't know, Your Honor. But you know that in the immigration courts, there are a lot of incompetent lawyers practicing there. Absolutely. You know that. Without question. And the government knows that. And you know that a disbarred lawyer can practice before the immigration court. Am I right? Yeah, take my word for it. Okay. Yeah. And so you basically have an attorney here who fails to act on behalf of his client. Well, Your Honor, respectfully, the immigration judge set forth exactly what she wanted directly to the petitioner herself. And remember here, after they said we rest on the record, reluctantly they eventually gave testimony. And when the immigration judge asked her, asked the petitioner herself, well, did you go to the embassies like I told you? Did you go to the consulate? And she said no. And she said, well, what did you do? Well, I went to this community of Ethiopians, and we emailed them, and the embassy said they couldn't help me. Well, do you have copies of those emails? I didn't know you wanted them. Well, what about your uncle? I told you to go see your uncle to try and get corroborating evidence from him. Well, his whereabouts are unknown now. I don't know how to contact him. But there's letters from her uncle, and she had two witnesses, and there were pictures of her family's house. What about all that? Isn't that corroborating evidence, too? Well, respectfully, those witnesses had no personal knowledge of what her ethnicity was. And those documents, some of those documents – Well, that would be there when she was born, according to you. I mean, you're the government. Look, this is a situation where the immigration judge specifically told her how to get around those problems. She specifically outlined what she wanted, and there was no indication that she was even willing to try to do that. And specifically, when you think about it, why would you rest on the record when you know that what you have isn't sufficient? Because she had this lawyer over there that didn't know what he was doing, you know, or didn't care. Respectfully, Your Honor, there's no indication that the attorney here didn't know what they were doing. There's been no allegation of ineffective assistance of counsel here. Why would he just get up and say, we rest on the record? Exactly. Why would he say that? Why would he say that? Because he knows they didn't comply with the standard, or maybe there was a problem with her ethnicity. The bottom line is we don't know. Maybe the documents don't exist. Well, that may be true. It's possible they would have gone to the consulate or the embassy and they wouldn't have been able to get anything. It's possible they would have gone to the uncle. But you have to explain that to the immigration judge when the immigration judge specifically tells you what that judge is looking for. Well, she told him that she didn't even know where she could get a birth certificate. You know, a lot of those countries, they don't keep track of birth certificates and births, particularly of women. You know that, don't you? That's true. There's no question about that. They don't even know what a birthday is of women or what year they're born. It's true that she might not have been able to obtain a birth certificate, but she did testify on the record that this place called the Cabela did keep records of people's nationality and ethnicity and that those things were kept. And she did indicate that there was a birth certificate somewhere out there. Now, during the testimony of one of her witnesses, he said he was afraid to go get that because he was afraid of the consequences of going to get that birth certificate. But we are, according to the petitioner herself, there is a birth certificate out there. That's a reasonable fear. Potentially. You know, they've been killing each other for how many years now over there? Well, according to the most recent country reports, there's been an agreement, and that was actually determined at the remanded hearing with the immigration judge that Eritreans are no longer being deported from Ethiopia. How many are left? Well, I don't know how many are left, Your Honor, but there's been a resolution to some extent with regard to that particular country problem in Ethiopia. Have you been keeping track of Ms. Mohamed? I mean, do you know what she's doing? Is she working? According to the testimony in the remand hearing, she was working and married to a lawful permanent resident. So to your knowledge, has she committed any crimes or done anything else? Not to our knowledge. She hasn't committed any crimes, no. Then she's not a terrorist. Not to our knowledge, no. All right. So she's just someone who couldn't produce a birth certificate. It's more than just a birth certificate. What she couldn't produce was any evidence that she tried to comply with what the immigration judge wanted. I mean, this is what you want an immigration judge to do. It's like, look, you have tons of inconsistencies. You've submitted evidence which, according to forensics documents, is of questionable authenticity. You've got inconsistencies in not only your story with regard to your parents' deportation, but she alleged that two different people may have raped her. I mean, it's just with all these inconsistencies, the immigration judge said, look, get me the easy stuff. Go to the embassies. Go to the airlines. All these things you can do in the United States. Go to your uncle. And they decided to remand on the record, and then only at the prodding of the immigration judge did they finally say, well, whereabouts are unknown. Does this woman speak English? She speaks a little bit of English, or at least she did at the time. I don't know to what extent her proficiency is. Was there a translator there? Yes. There was a translator there. So the problem here is not satisfying to the satisfaction of the immigration judge. I mean, the immigration judge did not put a huge series of hoops here for her to jump through. He clearly outlined what she needed, things that she can do within the United States, things that were not difficult, that weren't going to cost her enormous amounts of money. I mean, basic records. And at the very least, she could have shown that even if she had gone to the embassy or the consulate, if something wasn't available, at least you could get something from the consulate saying, we can't help you, some sort of correspondence, something to satisfy the immigration judge, that there's a willingness to try and find that easily available corroborating evidence. See, that's the key, easily available corroborating. That's the standard. Right. It may or may not be easily available. Well, certainly not easily available. Well, in the immigration judge's mind, he felt that this was easily available. Well, the easily available, as our circuits talked about it, has been when there's a key witness and they're 45 minutes away. Correct. But that doesn't sound like this case. Well, what about airline records? I mean, what was... How available are airline records? I mean, I don't know the answer. You go to the airline and you say, do you have a record of a manifest? Did they try to do that? No, they didn't try to do that. No, they didn't try to do that. When I need to turn in a, you know, something on a receipt. When you have months and months and months, the immigration judge has told you, this is what I want, and you don't even try? I mean, that's really the issue here. There's no evidence that she even tried to comply. Well, let me ask you this. The immigration judge, did he make an adverse credibility finding? He did after the remanded proceedings, yes, but not in the initial proceedings. Not in the initial proceedings. So his ruling was based on his belief that Muhammad failed to meet her evidentiary burden to establish eligibility for relief. That's what it was based on, wasn't it? Yes. Okay. But that was erroneous, because corroborative evidence is not mandatory in asylum proceedings. Your Honor, I'm out of time, may I finish? All right. We'd like to have you here. I'm sorry, what? We'd like to have you here. Oh, okay, thanks. This Court has established that where the immigration judge doesn't know what to believe, that you can go for easily available corroborating evidence. Now, the immigration judge here told the petitioner what he thought that was, and certainly there was plenty of reason for the immigration judge not to know what to believe. I mean, in the record we have the petitioner with four different names at various points in time. We have an INS background check, which contradicts her claim of presenting a Kenyan passport under the name of Jane Alexander. We have a forensics analysis of a document that she submitted as evidence, which is of questionable authenticity, which used optical brighteners and paper not consistent with that distributed in Ethiopia. We have contradictory testimony regarding the deportation of her parents. At one point she said she was hanging on to them. At another point she said she saw them through a screen or a curtain. So there was plenty of reason here not to know what to believe. A worse immigration judge would have found her not credible right there. But the immigration judge said, look, go get me the easy stuff so we can get past this and move on to bigger and better things. Thank you very much for your time, Your Honors, and we would respectfully request that you uphold the decision of the Board of Immigration Judges. All right. We'll hear from counsel. You've got a minute or two for rebuttal. Your Honors, first I have to disagree with counsel for the respondent about the statement that the petitioner said that she had a birth certificate. I think if you go back and you look at the record, the first thing that she says when the immigration judge asks her about her birth certificate is, I don't have one, I was born at home. And I don't think she ever acknowledged that she actually had a birth certificate. And I think that's pretty common for these countries, particularly Ethiopia. The immigration judge did give her a blueprint of what she wanted. The problem is that those documents were not available. Again, the petitioner did indicate that perhaps there would be a local government entity in Addis Ababa that might have records, but she also explained that she couldn't go back. And it's very obvious from the record that it would be very dangerous for an Eritrean family to go to that organization during this period of time. There was an ethnic cleansing going on. I think it's unfair. Well, didn't she provide some evidence of her identity through a person by the name of Elias Abdullah, a neighbor of the family, her family that lived in Ethiopia, and that he testified he knew the family. They were of Eritrean background, and he knew that the family might have spoken Turganian. That's the language at one time. And the IJ accepted that neighbor's testimony is credible. Yes, Your Honor. Well, why don't you tell us about that? That was how the petitioner attempted to prove her identity. And we would submit that that is, under these circumstances, that should be enough. She called an old friend of her family who had known her uncle, who was living in Saudi Arabia at that time, but his friend had lived in Addis Ababa and had been a neighbor of the petitioner's family when she was a very young child, and he testified essentially to what you stated. Well, didn't she provide four letters of evidence of her Eritrean identity? And one was from a family's neighbor in Ethiopia, two from her uncle, Abu Bakr Mohammed, who's in Saudi Arabia, and one from another uncle, Saeed S. Fu. And the IJ, what was the IJ's ruling on those letters? I think they were admitted into evidence. What? The letters were admitted into evidence. Some of the witnesses were not able to come and testify. They live in other countries. And by the end of the proceedings, Ms. Mohammed was very emotional that she had pretty much lost contact with almost her entire family. And I think that really comes out when you go back and you review the record. Well, I think the IJ, what he did was he or she said the letters were uninformative as to identity, no explanation given. He didn't give the letters any great weight. This is quotes. And he dismissed them as sufficient corroborating evidence. And, Your Honor, in this case, the letters, I think they are what they are. I think the strongest evidence is really the testimony of the witnesses and also Ms. Mohammed's testimony. And I would submit to this Court that it's consistent. Her testimony was consistent. I believe there were four or five hearings. And even on remand, she did testify about the steps she had taken to try and procure her identity documents and why she had been unsuccessful in that. So she got married. Who is she married to? A citizen or local? I believe he's naturalized now. Naturalized citizen. And does she have children? Not that I'm aware of. Okay. When was the last time you talked to her? Yesterday. I'm going to call her today after. All right. After this. Again, we'd ask that the Court reverse the agency decision. Matters submitted. Thank you. Thank you. Just to give the youngsters from Brentwood a little history lesson, you know there was this event, this great battle, World War II. Have you heard about that? I'm a veteran of World War II. And when a lot of these troubles started out, I wasn't much older than you kids are, see? And a lot of it started out in Ethiopia, in Eritrea, where Mussolini, the dictator of Italy, thought that he'd go down there and Ethiopia's by the horn of Africa, you know, the geography, the horn of Africa. And he sent his air force down there and his army, and they went there to conquer the Ethiopians. And all the Ethiopians, and that included the Eritreans, all they had were spears. And in the first portions of the war, they defeated the Italian army. And then they were conquered. And the emperor of Ethiopia, which would include Eritrea at the time, was a man named Haile Selassie. And he was known as the Lion of Judah. And he was a descendant of King Solomon. You heard of King Solomon? Yeah. And Bathsheba, who was an Ethiopian woman. And she was the queen there. And so that country has a long history. And Haile Selassie went before the United Nations somewhere around 1934, somewhere in that area, and pled with the United Nations to put pressure on Mussolini to stop that war, which was a war of conquest, and to save Ethiopia. But the United Nations was weak or unconcerned. And I mean, I'll never forget seeing a film of this little man with a beard pleading for peace for his country. But our United Nations, not in the United Nations, I'm sorry, League of Nations, League of Nations that grew out of World War I. But they did nothing. And then the war raged on. And more people got drawn into it. And when it was over with, who knows, maybe 40 million people died. So that's what I remember about Ethiopia and Eritrea. And then you may learn in school that the Rift Valley is nearby. And it's in the Rift Valley where our scientists tell us that human beings first developed. And so it's a fascinating part of the world over there. And so I hope you're all quizzed on this and you all get A's on your paper. And I hope the teacher will give me at least a B-. Okay, so we'll take the next one. This is submitted. All right, go upstairs and they're going to have a break. They're going to have donuts and orange juice and get a little tour. Okay. Okay. Bye. Thank you for visiting today. Your kids are well behaved.
judges: Pregerson, Wardlaw, Archer